UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KATHLEEN BIONDO,

                Plaintiff,

v.

KALEIDA HEALTH d/b/a/ BUFFALO
GENERAL MEDICAL CENTER,

                Defendant.

Case # 15-CV-362-FPG-LGF

DECISION AND ORDER

## INTRODUCTION

Plaintiff Kathleen Biondo ("Plaintiff") brings discrimination claims against Defendant Kaleida Health d/b/a/ Buffalo General Medical Center ("Defendant"), alleging that Defendant failed to provide her with sign language interpretive services during a September 21-26, 2014 stay at the hospital. ECF No. 1. Plaintiff seeks monetary, declaratory, and injunctive relief under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("RA"); Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L § 290 *et seq.*; and the City of Buffalo Antidiscrimination Law, Buffalo Code pt. II, § 154-9 *et seq.* Defendant has moved for summary judgment. ECF No. 46. For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED in its entirety.

## BACKGROUND[1]

### I. Plaintiff's Experience at Buffalo General Medical Center

Plaintiff is a deaf individual who primarily communicates in American Sign Language ("ASL"). She can read and write English but claims to do so with limited proficiency. On Sunday,

---

[1] The following facts are undisputed and are taken from each party's Statement of Material Facts (ECF Nos. 50, 57) unless otherwise noted.

1

September 21, 2014, Plaintiff felt lightheaded and passed out on the floor of her home. Her husband, Andrew Biondo, drove her to Defendant's emergency room ("ER"). Plaintiff and her husband arrived at the ER around 10:30pm and requested an ASL interpreter upon check-in. According to Plaintiff and her husband, they both told nurses that Mr. Biondo could not translate for Plaintiff because there would "be misunderstandings." K. Biondo Dep. Trans. 227:14-15. Later in the evening, Dr. Michael Tinnesz assessed Plaintiff and noted that Plaintiff "translates through her husband at the bedside with sign language" and that she was "awake, alert, and appropriate, answering all questions . . ." ECF No. 50-1 at 58. The doctor noted that he would send off routine labs and anticipated that Plaintiff would be admitted to the hospital. *Id.*

At some point after Dr. Tinnesz's assessment, Mr. Biondo asked the nurse examining Plaintiff when the ASL interpreter would arrive. The nurse informed Mr. Biondo that "they couldn't get a hold of anybody" because of the late hour. A. Biondo Dep. Tr. 58: 4-6. Mr. Biondo continued to follow up with the nurses about an ASL interpreter, but an interpreter never came. Around 3:00am on Monday, Plaintiff was admitted to the hospital as an inpatient. In the absence of a professional interpreter, Mr. Biondo, who knows ASL and had experience interpreting for his wife at some of her past medical appointments, interpreted for his wife but felt uncomfortable and at times ill-equipped to fully convey to his wife everything that the doctors were telling him.

Later that morning, Plaintiff underwent a table tilt test, which helps diagnose patients who feel faint or lightheaded. A nurse explained the test to Plaintiff before administering it, and Plaintiff signed a consent form that also explained the test in non-technical language. Plaintiff passed out during the test and became distraught when she woke up. The doctor comforted Plaintiff and told her she had a vasovagal condition. He explained the diagnosis, and a nurse gave her printed materials that further explained vasovagal conditions.

On Tuesday, Mr. Biondo returned to work while Plaintiff stayed in the hospital. In Mr. Biondo's absence, Defendant's staff communicated with Plaintiff through written notes, because her medical records indicated that written English was her preferred method of communication and did not indicate that Plaintiff ever requested an interpreter. ECF No. 50-1 at 134. Plaintiff reported feeling light-headed, and a nurse gave her medication that abated her condition. According to Plaintiff, she kept asking the nurses for an interpreter, and they kept saying "we will, we will, we will." K. Biondo Dep. Tr. 173: 6-7. When Mr. Biondo arrived after work, he again asked a nurse about getting an interpreter. The nurse told him that none were available. Mr. Biondo stopped asking about interpreters out of frustration.

On Wednesday, Mr. Biondo again went to work while Plaintiff stayed at the hospital. Plaintiff was transferred to a new unit of the hospital. Nurse Manager Jennifer DiPasquale, who oversaw the unit's nursing practice, introduced herself to Plaintiff and asked if she needed anything. J. DiPasquale Dep. Trans. 91:2-5. Plaintiff "started attempting to speak to" DiPasquale, at which point DiPasquale noticed that Plaintiff was hearing impaired and retrieved a pen and paper. *Id.* DiPasquale wrote to Ms. Biondo, "Is it okay to communicate with you like this?" *Id.* at 91:15. Plaintiff confirmed that it was, and then Plaintiff continued writing notes back and forth with DiPasquale about her treatment. DiPasquale did not offer Plaintiff an ASL interpreter or ask if she had already been offered one because Plaintiff indicated that note writing was sufficient. *Id.* at 93:3-11.

Later that day, a doctor requested an endocrinology consult to rule out adrenal insufficiency as a cause of Plaintiff's symptoms. The doctor completing the consult communicated with Plaintiff via paper and pen, but Plaintiff said she was frustrated and did not understand what was going on. Throughout the day, Plaintiff repeatedly grew frustrated and would shake her head when she did

3

not understand something, but she did not write any notes saying that she did not understand or that written communication was insufficient. Mr. Biondo briefly stopped by the hospital to visit Plaintiff after work on Wednesday but then left to fill in for Plaintiff as a volunteer at St. Mary's School for the Deaf. He did not speak with any doctors or ask anyone for an interpreter that evening. A. P. Biondo Dep. Trans. 101-111.

Plaintiff remained in the hospital on Thursday, September 25, 2014 and again wrote notes back and forth with hospital staff. During a physical therapy session, Plaintiff was "so upset" to communicate in writing with the therapist, and she would point to words in the therapist's written notes and shake her head because she did not understand them. Even when the therapist clarified his writing with more simple terms that she could understand, Plaintiff was still upset because "that [was] not satisfactory to [her.]" K. Biondo Dep. Trans. 189:1-4.

Finally, on Friday, September 26, 2014, Plaintiff saw her "morning doctor," who told her that she could go home. ECF No. 50-3 at 192. Plaintiff signed her discharge instructions, which were written in lay-terms, and then left the hospital in the afternoon.

## II. Defendant's Interpreter Policy

Pursuant to Defendant's policy, staff must inform hearing impaired patients of their right to "free language interpretation or Deaf/Hearing Impaired services." ECF No. 50-20 at 1. Interpreter services "must be provided in all circumstances when a person is unable to speak, read, write or understand the English language at a level that permits him/her to interact effectively with health providers to ensure effective communication in rendering appropriate medical treatment." *Id.* Additionally, if staff use a family member or companion to interpret, they should have the patient sign a waiver of interpreter services. ECF No. 50-20 at 3.

According to DiPasquale, who investigated Plaintiff's hospital stay after she filed a formal complaint, staff members did not follow Defendant's interpretive service policy because they did not notify Plaintiff of her right to free interpretation services. J. DiPasquale Dep. Tr. 183. DiPasquale also found that staff violated the policy by failing to obtain a signed waiver of interpretive services from Plaintiff. *Id.* at 184.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56).

To defeat summary judgment, therefore, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted). At the summary judgment stage, a nonmoving party

5

"must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir.1998).

## II. Rehabilitation Act Claim

Plaintiff raises a claim for monetary damages under the RA. Section 504 of the RA provides that no "otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The RA's implementing regulations require hospitals receiving federal funds to "establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. § 84.52(c). Additionally, "[a] recipient ... that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." *Id.* at § 84.52(d)(1). Aids are "appropriate" if they ensure "effective communication with individuals with disabilities" and may include interpreters, note takers, and "written materials." 28 C.F.R. § 36.303.

Patients with disabilities are not entitled to the auxiliary aid of their choice unless it is necessary to ensure effective communication. *See, e.g., Bravin v. Mount Sanai Med. Ctr.*, 186 F.R.D. 293, 302 (S.D.N.Y. 1999) ("[T]he RA does not require public entities to provide ASL interpreters to deaf individuals in every instance."). While Department of Justice regulations advise public accommodations to "consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, . . . the ultimate decision as to what measures to take rests with the public accommodation," so long as the resulting communication is effective. 28 C.F.R. §36.303(c)(1)(ii).

These auxiliary aids "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2). In other words, the RA does "not ensure equal medical treatment, but does require equal access to and equal participation in a patient's own treatment." *Loeffler v. Staten Island Univ. Hosp.*, 582 F. 3d 268, 275 (2d Cir. 2009). Therefore, to determine if an entity discriminated against a disabled patient, the factfinder must assess "whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an equal opportunity to benefit from the hospital's treatment." *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012).

To receive monetary damages under the RA, a plaintiff must show that (1) the healthcare entity violated her rights under the RA, and (2) that the entity did so with discriminatory intent. *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998). To prove discriminatory intent in the Second Circuit, the plaintiff need not show that the defendant possessed "personal animosity or ill will." *Loeffler*, 582 F.3d at 275. Instead, it is sufficient for the plaintiff to show that a "policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federal protected rights will result from the implementation of the [challenged] policy . . . [or] custom." *Id.* at 275 (quoting *Bartlett*, 156 F.3d at 331).

The Second Circuit has never explicitly defined deliberate indifference in the context of the RA, but it has stated that "it is at least instructive that [the Supreme Court in *Gebser v. Lago Vista Indep. School Dist.*] described the requirements of deliberate indifference as . . . [A]n official who at minimum has authority to address the alleged discrimination and to institute corrective measure on the recipient's behalf has actual knowledge of discrimination in the recipient's

7

programs and fails adequately to respond." *Loeffler*, 582 F.3d 268 (citing *Gebser v. Lago Indep. School Dist.*, 524 U.S. 274, 290 (1998)). The Second Circuit in *Loeffler* also stressed that, in "a separate context [outside of the RA], we have also said that deliberate indifference must be a 'deliberate choice, rather than negligence of bureaucratic inaction.'" *Id.* at 276.

In *Loeffler*, the court denied summary judgment against a hospital that failed to provide an ASL interpreter for a patient undergoing heart surgery and his wife. The couple requested sign language interpreters from the defendant hospital's Patient Representative Department and from some nurses. *Id.* 272. They also requested an interpreter from a doctor, who "laughed . . . off" the request. *Id.* The couple's children instead had to translate for their parents[2] and missed several days of school. In holding that a jury could find that the hospital was deliberately indifferent to the patient's rights, the court emphasized that "Dr. Sithian—arguably a policymaker—dismissed [the patient's] demand for an interpreter [by] 'just kind of laugh[ing] it off, and played it as a joke.'" *Id.* at 276. The court also stressed that, while the hospital had a "policy in place to provide interpreters . . . the obvious shortcomings in the policy" and "the alleged apathetic response of Dr. Sithian, notwithstanding his authority to correct the discrimination, could lead a reasonable jury to conclude that the Hospital was deliberately indifferent; and its indifference to the Loefflers' rights may have been so pervasive as to amount to a choice." *Id.* at 277.

Despite *Loeffler*'s emphasis on "policymakers" or "officials," some district courts in the Second Circuit have not acknowledged that the deliberate indifference standard requires that a policymaker or official be on-notice of potential violations of a patient's rights. *See, e.g.*, *Viera v. City of N.Y.*, No. 15 Civ. 5430 (PGG), 2017 WL 3130332 (S.D.N.Y. July 21, 2017) (discussing the deliberate indifference standard without mentioning policymakers or officials, and analyzing

---

[2] The hospital even gave the children pagers so that they could be available to translate for their parents at any hour. *Loeffler*, 582 F.3d at 281.

hospital staff's knowledge of patient's rights without assessing whether those staff members were officials). While *Loeffler* did not discuss the policymaker requirement at length, the Eleventh Circuit in *Liese* more thoroughly explained the importance of that requirement, using the same Supreme Court case law that the Second Circuit relied on in *Loeffler*.

The court in *Liese* explained that Congress passed the RA under its Spending Clause power. *Liese*, 701 F.3d at 348. Accordingly, Congress wished to "avoid the use of Federal funds to support discriminatory practices" but also wanted to ensure that "the defendant-entity had actual notice that it was in violation of [the RA] and had an opportunity to rectify the violation." *Id. See also Gebser*, 524 U.S. at 275 ("It is sensible to assume that Congress did not envision a recipient's liability in damages where the recipient was unaware of the discrimination.") For the defendant entity *itself* to have actual notice that it was violating the RA, it is not sufficient to show that *any* particular employee—no matter where they stood in the organization's employee hierarchy—knew that a patient's RA rights were being violated. Otherwise, "there would be a risk that the recipient [entity] would be liable in damages not for its own official decision but instead for its employees' independent actions." *Id.* at 291.

Instead, a "natural reading of *Gebser* reveals that the purpose of the 'official' requirement is to ensure that an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization." *Liese*, 701 F.3d at 350. In *Liese*, the court held that a doctor who knew that a patient was requesting an interpreter and ignored her was an official under *Gebser* because, unlike a nurse, he had "supervisory authority," could "overrule a nurse's decision to not provide an auxiliary aid," and there was no evidence that his "decisions were subject to reversal." *Id.* at 350.

9

Plaintiff asserts that DiPasquale is the type of official that *Gebser* contemplated because, "as the nurse manager of the floor in which Ms. Biondo was an admitted patient," she "was clearly in a position of 'authority to correct the discrimination, and failed to respond adequately.'" ECF No. 58 at 12. Plaintiff's argument, however, ignores the first component of the *Gebser* test—that the official have "actual knowledge of discrimination." *See Gebser*, 524 U.S. at 276. Even if DiPasquale is an official under *Gebser*, there is no record evidence that DiPasquale knew that Defendant violated Plaintiff's rights under the RA.[3] Plaintiff specifically told DiPasquale that it was acceptable to communicate with her using pen and paper, and the two proceeded to communicate about Plaintiff's medical care and her medications that way. Additionally, Plaintiff's medical records indicated that her preferred method of communication was written English and did not indicate that she requested an interpreter. DiPasquale simply had no reason to believe that Plaintiff could not effectively communicate with hospital staff.

Plaintiff and her husband both testified during their depositions that they asked a few unnamed nurses for an interpreter, but there is no evidence that those nurses were officials—nor does Plaintiff argue that they were. There is also no evidence to support that any other potential official knew that Plaintiff could not effectively communicate with hospital staff. Assuming that Plaintiff and her husband actually asked hospital staff for interpreters, which the Court must do at the motion for summary judgment stage, Defendant's policy on interpreters failed Plaintiff. Dipasquale's investigation revealed as much. The record indicates, however, that Defendant's failure was, at most, negligence or bureaucratic inaction. Without an official's knowing failure to

---

[3] Whether Plaintiff's rights were violated under the RA is likely a triable issue of fact. *See Chisolm v. McManimon*, 275 F. 3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."). The Court need not elaborate on this point, however, because Plaintiff has not shown that an official was aware of any discrimination against her.

provide Plaintiff with a necessary auxiliary aid, Defendant is not liable for discrimination under the RA. Accordingly, Plaintiff's claim for damages under the RA is DISMISSED.

### III. Injunctive and Declaratory Relief

Plaintiff seeks declaratory and injunctive relief under the RA and Title III of the ADA.[4] Defendant argues that Plaintiff lacks standing to obtain such relief because she "cannot show that she is likely to require treatment at Buffalo General in the future, or, that she would again be denied interpreting services if she were to require treatment at the hospital." ECF No. 51 at 6.

To establish standing, a Plaintiff must first establish that she suffered an "injury in fact," which the Supreme Court defines as "an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id. Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). For a plaintiff seeking declaratory or injunctive relief, allegations of past injury alone do not suffice to establish an injury in fact. *See Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992); *Golden v. Zwickler*, 394 U.S. 103, 109-10 (1969). Instead, the plaintiff must show a "real and immediate threat that the injury will be continued or repeated." *Farmland Dairies v. McGuire*, 789 F. Supp. 1243, 1250 (S.D.N.Y. 1992).

Courts in the Second Circuit have analyzed this standing requirement in cases similar to the one at bar. In *Schroedel v. N.Y. Univ. Med. Ctr.*, 885 F. Supp. 594 (S.D.N.Y. 1995), a deaf patient sued a hospital for failing to provide her with sign language interpreters during a visit to the hospital's emergency room. The court ruled that the plaintiff had "not established a real and immediate threat of repeated injury sufficient to confer standing for injunctive relief." *Id.* at 599. Because the hospital was not the nearest medical center to the plaintiff's home or office and she previously visited the hospital on only one other occasion, the court dismissed the possibility of

---

[4] Title III of the ADA does not provide for damages. *See Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 186 (2d Cir. 2013).

11

the plaintiff returning to the hospital as "mere speculation." *Id.* Similarly, in *Freydel v. New York Hosp.*, No. 97 Civ. 7926 (SHS), 2000 WL 10264 (S.D.N.Y. Jan. 4, 2000), a deaf patient who sued a hospital that failed to provide her with ASL interpreters argued that she had standing to pursue injunctive relief because "her local community hospital [was] part of a medical network which [included defendant hospital] as a tertiary care center, so that future referrals to [defendant hospital] were possible." *Id.* at *3. The court rejected the plaintiff's argument, because one "visit to a hospital [did] not establish that [the plaintiff was] likely to again find herself seeking treatment at" the defendant hospital and that plaintiff "failed to provide evidence of a likely future encounter between herself and defendant." *Id.*

Courts have also rejected plaintiffs' standing arguments in cases where the plaintiff had a more extensive history with the defendant hospital. In *Naiman v. N.Y. Univ*, No. 95 Civ. 6469 (LMM), 1997 WL 249970 (S.D.N.Y. May 13, 1997), the court held that a deaf plaintiff who visited the defendant hospital four times did not plead a sufficient likelihood of future harm to establish standing. In granting the plaintiff leave to amend his complaint, the court advised him that he must show a real or immediate threat "that he will require the services of the [defendant hospital] in the future" and that he should show why the defendant hospital, "as opposed to some other hospital," is the facility that he would visit in the future. *Id.* at *14.

Here, Plaintiff has not shown that she is likely to visit Defendant in the future. In her deposition, she repeatedly stated that she would only come back to Defendant if she had "no choice." K. Biondo Dep. Trans. 231-232. Furthermore, in her 30 years of living in the area, Plaintiff has visited Defendant for medical treatment twice but has visited other hospitals at least 31 times for scheduled and emergency medical care. ECF No. 51 at 10. Additionally, several other hospitals are closer to Plaintiff's home and office than Defendant. *Id.* Any assumption that

Plaintiff will return to Defendant is at best speculative and falls short of the "real and immediate threat" standard necessary to establish standing. Accordingly, Plaintiff's claims for declaratory and injunctive relief under the ADA and the RA are DISMISSED.

## IV. NYHRL and City of Buffalo Antidiscrimination Law claims

Because the Court dismissed the federal claims in this case, it declines to exercise supplemental jurisdiction over the NYHRL and Buffalo Antidiscrimination Law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties . . .").

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 46) is GRANTED and this case is DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: April 10, 2018
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court